In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1515

GEORGE L. BROWN,

*Petitioner-Appellant*,

*v.*

CHERYL EPLETT,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:19-cv-01010-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED NOVEMBER 10, 2021 — DECIDED SEPTEMBER 7, 2022

Before MANION, ROVNER, and WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge.* A Wisconsin jury convicted George Brown of first-degree reckless injury by use of a dangerous weapon after he stabbed his cousin K.M.[1] in the head during a

---

[1] Consistent with Wisconsin law, the parties have identified the victim
(continued...)

drunken brawl at Brown's home. *See* Wis. Stat. § 940.23(1)(a). Brown now seeks relief in habeas corpus, arguing that he was deprived of due process when the trial court erroneously refused to instruct the jury on the castle doctrine as part of his self-defense theory. We affirm the district court's decision denying his habeas petition.

**I.**

Brown had agreed to host a barbeque at his Madison, Wisconsin home in July 2014 to celebrate the new job for which K.M.'s wife had been hired. K.M. and Brown both became inebriated as they drank throughout the afternoon and evening. As the hour grew late, Brown and K.M. got into an argument that escalated into a physical altercation in the garage. Friends tried to break up the fight, urging K.M. to leave. K.M. struck a friend in the mouth in the process, causing that individual to wash his hands of the matter and go home. K.M.'s wife Rebecca managed to escort K.M. to his car, which was parked on the cul-de-sac in front of Brown's house. But the fight continued: K.M. doffed his undershirt and threw his shoes at Brown and Brown responded in kind, removing his own shirt and throwing pieces of scrap trim lumber at K.M.[2]

According to K.M.'s wife Rebecca, K.M. was standing in the street when Brown said "I've got something for you" (R. 5-5 at

---

[1] (...continued)
solely by his initials. *See* Wis. Stat. § 809.86(4). We shall do the same.

[2] Brown had the scrap lumber on hand for use in a smoker that he used to ward off mosquitoes. He threw some 21 pieces of the wood at K.M.

2), went into his house, came back outside, at which point Rebecca saw a knife in his hand, and walked down the driveway toward K.M. By her account, K.M. backed away and picked up two pieces of wood that Brown had thrown at him. The men continued to argue. Brown took a swing at K.M. with the knife, K.M. swung back with the wood, and ultimately Rebecca heard a crack and saw her husband spin around and drop to the ground with the knife buried in his head.

Brown gave a different account of events when he took the witness stand at trial. He said that while he was standing at the top of his driveway, K.M. picked up the two pieces of wood (which Brown described as "sticks") and came up the driveway toward him. Fearing what K.M. might do, he picked up a knife from the grill outside of his garage. K.M. approached and raised his hands as if he were about to strike Brown. K.M. stood 6 feet tall, weighed 220 pounds, and at age 39 was nearly 20 years younger than Brown. Brown went into "combat mode" (R. 5-13 at 73) and swung his knife at K.M. He did not realize he had actually stabbed K.M. until K.M. walked back down the driveway to his car and collapsed in the street.

In the moments immediately after he stabbed K.M., Brown did not call 911 to summon aid for K.M., did not voice concern for him, and did not express remorse for what had occurred. Instead, according to multiple witnesses, he made statements to the effect of "that will teach him" (R. 5-11 at 67), "I should have killed your ass" (R. 5-10 at 94, 98), "He ain't dead yet but I'll kill him" (R. 5-11 at 49), and, to the victim's wife, Rebecca, "I got one for you too, bitch" (R. 5-11 at 61; *see also* R. 5-11 at 31; R. 5-13 at 33). Indeed, according to Rebecca, after making the latter remark, Brown walked down the driveway toward her

with what looked like another knife in his hand. Brown would later acknowledge having made such remarks, attributing them to the heat of the moment, when he was still feeling the effects of adrenaline from the confrontation. But in the ensuing days, in multiple recorded telephone calls from jail to Jill Phillips, whom he was then dating, Brown made a series of statements seemingly attributing the stabbing to anger and exasperation with K.M. as opposed to fear for his own safety. For example, he said that on the night of the barbeque, K.M. had "pissed me off" and "ask[ed] for it," despite "know[ing] better." R. 5-13 at 113–15. "Why push my buttons[?]" he asked Phillips. "Why push them when you know I'm going to go. Why take me there when you already know I'm going to go. Shit." R. 5-13 at 115. He also acknowledged to Phillips that he had "fucked up" and "put myself in this position." R. 5-13 at 113, 115.

The knife wounds on K.M.'s body indicated that he was struck a total of three times: once in the upper left shoulder, where he had a wound 3.5 centimeters long, once on the back of his left arm, where he had a 2.5-centimeter wound, and once in the head, in front of his left ear. Brown stabbed K.M. in the head forcefully enough that the knife's 8-inch blade penetrated the skull at his left temple, passed through the brain, and lodged in the skull on the right rear side of his head. K.M. survived the stabbing but was left with numerous cognitive and physical impairments and will require care for the remainder of his life.

Brown was charged with both first-degree attempted homicide and first-degree reckless injury. He pleaded not

guilty to the charges and the State's case against him was tried before a jury over the course of four days.

Brown's theory of the case was that he stabbed K.M. in self-defense. The standard Wisconsin jury instruction on self-defense advises the jury that a defendant who invokes the privilege of self-defense must have reasonably believed that the amount of force he used was necessary to terminate an actual or imminent unlawful interference with his person.[3] And

---

[3] Thus, the instruction given to the jury in this case provided, in relevant part, as follows:

> The law of self-defense allows a defendant to threaten or intentionally use force against another only if the defendant believed there was an actual or imminent unlawful interference with the defendant's person and the defendant believed that the amount of force the defendant used or threatened to use was necessary to prevent or terminate the interference and that the defendant's beliefs were reasonable.
>
> The defendant may intentionally use force which is intended or likely to cause death or great bodily harm only if the defendant reasonably believed that the force used was necessary to prevent imminent death or great bodily harm to himself.
>
> A belief may be reasonable even though mistaken. In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense.
>
> The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of

(continued...)

although the jury is further advised that an individual protecting himself from another has no duty to retreat, the instruction nonetheless allows the jury to consider the availability and feasibility of retreat when evaluating the reasonableness of the defendant's use of force.[4] But Brown asked the court to modify the instruction to reflect the castle doctrine, which grants an individual greater latitude in using force to defend himself on the premises of his home and gives a defendant claiming self-defense in that setting a substantial leg up in the jury's assessment of the defense. *See State v. Johnson*, 961 N.W.2d 18, 26 (Wis. 2021). Here, a self-defense instruction reflecting the castle doctrine would have directed the jury to presume that the defendant reasonably believed his use of force was necessary to protect himself from imminent death or great bodily harm

---

[3] (...continued)
    the jury now.
R. 5-14 at 21–22.

[4] The jury was specifically advised as follows on the matter of retreat:

> There is no duty to retreat. However, in determining whether the defendant reasonably believed the amount of force used was necessary to prevent or terminate the interference, you may consider whether the defendant had the opportunity to retreat with safety, whether such retreat was feasible, and whether the defendant knew of the opportunity to retreat.

R. 5-14 at 22.

and would have expressly barred the jury from considering whether the defendant had an opportunity to retreat.[5]

For the castle doctrine to apply, the defendant must employ force against someone who is in the process of unlawfully and forcibly entering—or has so entered—the defendant's dwelling, which the legislature has defined to include the home's driveway. Wis. Stat. § 938.48(1m); *State v. Chew*, 856 N.W.2d 541, 543–44 (Wis. Ct. App. 2014). Consequently, it was material whether the final physical altercation between Brown and K.M. that culminated in the stabbing took place in the street or on Brown's driveway. *Cf. id.* at 545–46 (castle doctrine did not apply where intruders who attacked defendant had already left his apartment and were fleeing across the building's common parking lot, which did not constitute part of his dwelling, by the time he employed deadly force).

As our summary thus far indicates, there was a conflict in the testimony as to precisely where K.M. was located during

---

[5] The castle-doctrine version of the instruction would have advised the jury:

> There is no duty to retreat. You must not consider evidence relating to whether the defendant had an opportunity to flee or retreat in deciding whether the state has proved that the defendant did not act lawfully in self-defense.

Wis. Crim. Jury Instr. 810 n.1; R. 5-5 at 5. Additionally, consistent with statutory provision on the castle doctrine, the jury would have been instructed to "presume that the [defendant] reasonably believed that the force was necessary to prevent imminent death or great bodily harm to himself … ." Wis. Stat. § 939.48(1m)(ar).

the final altercation when Brown struck him with the knife:
Brown testified that K.M. had charged up the driveway to
where Brown was standing next to the grill at the top of the
driveway, whereas K.M.'s wife Rebecca testified that Brown
had come down the driveway and confronted K.M. in the
street. Apart from these two accounts, there was additional
witness testimony addressing this point.

Kelan Phillips ("Kelan"), a 13-year-old boy who lived across
the cul-de-sac from Brown's home, told police officers in the
immediate aftermath of the incident that he witnessed the
altercation from his upstairs bedroom window. According to
the officers, Kelan said that he saw K.M. standing in the street,
heard Brown yelling at K.M., saw Brown walk toward K.M.
and, when Brown reached the street, saw Brown strike K.M. in
the head. K.M. had something in his hand and raised his hand
as if to strike Brown, but he collapsed before he was able to do
so. When he was called to testify at trial, Kelan (then age 14) for
the most part professed not to recall what he saw on the night
of the incident or what he had told the police. The trial court
permitted the officers who had spoken with Kelan to recount
what Kelan had told them. Kelan's mother Jill was Brown's
girlfriend at the time of the incident. At one point in his
testimony, Kelan interjected without prompting that "George
is a nice dude, he is nice, he just made a wrong mistake that
day." R. 5-12 at 107.

Cynthia Harms, another neighbor who lived across the cul-
de-sac from Brown, also testified. On the night of the alterca-
tion, she had been asleep but was awakened by the sound of
yelling. When she looked out her upstairs bedroom window,
she saw shadows and heard scuffling near the driveway,

where Brown's red Ford Mustang was parked. (She could not see who was involved in the scuffle.) She went downstairs briefly to retrieve her phone and called the police. When she returned to the window, she saw a man (presumably K.M.) at the foot of the driveway and heard a woman (presumably K.M.'s wife Rebecca) telling him to get into the car. K.M. walked toward his car, which was parked at the curb immediately next to (and partially blocking) the mouth of the driveway, and then fell down in front of the vehicle.[6] Harms was asked directly at trial whether she had seen an altercation in the driveway, and she said that she had not: she said she had not seen anything that took place between the scuffle she initially heard and subsequently observing K.M. at the bottom of the driveway. She also testified that at no time during the period she was observing events across the street had she seen Brown, whom she knew. She did tell a police officer that at some point during the incident she heard a voice that she recognized as Brown's say, "I've got one for you too, bitch." R. 5-13 at 33.

The trial court denied Brown's request for an instruction on the castle doctrine, reasoning that K.M. was an invitee and thus was not in any way attempting to forcibly enter any part of Brown's dwelling.[7] Instead, the court gave the standard self-defense instruction. Among other points, the prosecutor

---

[6] Harms told the 911 dispatcher that K.M. fell in the grass next to the driveway.

[7] There was testimony, however, that prior to the stabbing, Brown had repeatedly told K.M. to leave.

argued in closing that even if Brown's version of events were believed, he had a feasible way of avoiding the near-fatal encounter with K.M. by retreating into his garage or house.

The jury acquitted Brown of the attempted homicide charge but convicted him on the reckless-injury charge. The trial court sentenced him to a period of 12 years in prison followed by 10 years of extended supervision. The court denied Brown's post-conviction motion asserting that it was error not to instruct the jury on the castle doctrine. The court reasoned in part, "In the instant action, the Castle Doctrine does not apply because [K.M.] was initially an invitee to a family barbeque. Addition-ally, there is not any credible evidence that [K.M.] was 'unlaw-fully or forcibly entering' any portion of Brown's 'dwelling' at the time of the stabbing." R. 5-2 at 53.

Brown appealed, arguing as relevant here that the refusal to instruct the jury on the castle doctrine was error. The State conceded that the instruction should have been given, as there was "some evidence" to support it, given Brown's testimony that K.M. had confronted him on the driveway of his home.[8] But the State argued that the error was harmless.

The Wisconsin Court of Appeals affirmed. It accepted the State's concession that the castle-doctrine instruction should have been given, but it agreed with the State that the error was

---

[8] "Wisconsin law establishes a low bar that the accused must surmount to be entitled to a jury instruction on the privilege of self-defense. The accused need produce only some evidence in support of the privilege of self-defense. Evidence satisfies the some evidence quantum of evidence even if it is weak, insufficient, inconsistent, or of doubtful credibility or slight." *State v. Stietz*, 895 N.W.2d 796, 802 (Wis. 2017) (cleaned up).

harmless. After canvassing the testimony, the appellate court found that the jury would have convicted Brown even if it had been instructed on the castle doctrine. In particular, the court found that no reasonable jury would have believed Brown's version of events as to where the stabbing took place. R. 5-5. The Wisconsin Supreme Court denied review. R. 5-8.

Brown then petitioned for a writ of habeas corpus in the district court. Judge Crabb denied the petition. She found in the first instance that Brown had fairly presented his due process claim to the state appellate court. But she went on to reason that Brown's claim of instructional error did not rise to the level of a constitutional violation, in that the error did not implicate the elements of the charged offense, but rather bore only on Brown's defense. Even if a due process violation had occurred, she added, the error was harmless. *Brown v. Jess*, 521 F. Supp. 3d 792 (W.D. Wis. 2021).

## II.

In this court, Brown renews his argument that the trial judge's refusal to modify the self-defense instruction to incorporate the material aspects of the castle doctrine rose to the level of a due process violation. As we discuss in greater detail below, Brown contends that the error in instructing the jury as to self-defense effectively modified a key element of the reckless-injury charge, thus violating his due process right that the jury be properly instructed as to each element of the charged offense. We can assume that Brown is correct in this regard. Nonetheless, we conclude that Brown is not entitled to a writ of habeas corpus because any such error was harmless.

The Antiterrorism and Effective Death Penalty Act authorizes relief under 28 U.S.C. § 2254 only when the state court's decision on the merits of the petitioner's claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if it either did not apply the proper legal rule or if the decision did apply the correct rule but reached the opposite result from the Supreme Court on materially indistinguishable facts. *E.g.*, *Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013). A state court decision amounts to an unreasonable application of Supreme Court precedent when it applies that precedent in a manner that is "objectively unreasonable, not merely wrong." *Woods v. Donald*, 575 U.S. 312, 316, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 1702 (2014)); *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010). By design, this is a difficult standard to meet. *Donald*, 575 U.S. at 316, 135 S. Ct. at 1376. A state court's application of Supreme Court precedent is not objectively unreasonable simply because we might disagree with that application, but rather only when no reasonable jurist could agree with it. *Davis v. Ayala*, 576 U.S. 257, 269–70, 135 S. Ct. 2187, 2199 (2015); *Donald*, 575 U.S. at 316, 135 S. Ct. at 1376; *Williams v. Taylor*, 529 U.S. 362, 409–11, 120 S. Ct. 1495, 1521–22 (2000).

We must first consider whether Brown fairly presented his due process claim to the Wisconsin appellate court. Before seeking relief in federal court, a habeas petitioner must first give the State the opportunity to address and correct any alleged violation of his federal rights, which means that he

must fairly present his federal claim through one complete round of review in state court, "thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004); *see also Duncan v. Walker*, 533 U.S. 167, 178–79, 121 S. Ct. 2120, 2127–28 (2001); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45, 119 S. Ct. 1728, 1732–33 (1999); *Whatley v. Zatecky*, 833 F.3d 762, 770–71 (7th Cir. 2016). The following factors are relevant to the determination of whether the petitioner has fairly presented his federal claim to the state court: (1) whether the petitioner relied on federal cases that engage in a constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Id.* at 771. "All four factors need not be present to avoid default [of the federal claim], and conversely, a single factor alone does not automatically avoid default. We must consider the specific circumstances of each case." *Id.* (citations omitted).

The instructional error that occurred in this case was, in the first instance, one of state law. Wisconsin has adopted certain principles that govern a standard claim of self-defense, and more recently it has also adopted the castle doctrine, which modifies those principles in cases where an individual is in his dwelling confronting an intruder. Errors of state law in and of themselves are not redressable in habeas corpus, *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 480 (1991); *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004), and this includes state-law instructional errors in non-capital cases, *Gilmore v.*

*Taylor*, 508 U.S. 333, 342, 113 S. Ct. 2112, 2117–18 (1993); *Estelle*, 502 U.S. at 71–72, 112 S. Ct. at 481–82; *Czech v. Melvin*, 904 F.3d 570, 574 (7th Cir. 2018); *Burris v. Smith*, 819 F.3d 1037, 1042 (7th Cir. 2016).[9]

However, "the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime of which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). Thus, instructions that reduce or shift the State's burden of proof or wholly omit an essential element of the charged offense could give rise to a due process violation. *See Waddington v. Sarausad*, 555 U.S. 179, 190–91, 129 S. Ct. 823, 831–32 (2009); *Cupp v. Naughten*, 414 U.S. 141, 146–48, 94 S. Ct. 396, 400–01 (1973); *Sanders v. Cotton*, 398 F.3d 572, 581–82 (7th Cir. 2005); *Cole v. Young*, 817 F.2d 412, 423 (7th Cir. 1987).

Brown was convicted of reckless injury. *See* Wis. Stat. § 940.23(1)(a). The offense of first-degree reckless injury requires the State to prove that: (1) the defendant caused great bodily harm to a human being; (2) by criminally reckless conduct; and (3) under circumstances which show utter disregard for human life. *United States v. McDonald*, 592 F.3d

---

[9] "All 50 States … recognize self-defense as a defense to criminal prosecution, … [but] the States have always diverged on how exactly to implement this interest, so there is wide variety across the Nation in the types and amounts of force that may be used, the necessity of retreat, the rights of aggressors, the availability of the 'castle doctrine,' and so forth." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 888 n.32, 130 S. Ct. 3020, 3106 n.32 (2010) (Stevens, J., dissenting) (citations omitted).

808, 811 (7th Cir. 2010) (citing *State v. Jensen*, 613 N.W.2d 170, 173 n.2 (Wis. 2000)); *State v. Kloss*, 925 N.W.2d 563, 567 (Wis. Ct. App. 2019), *review dismissed as improvidently granted*, 939 N.W.2d 564 (Wis. 2020). Conduct is defined as "criminally reckless" when "the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk." Wis. Stat § 939.24(1).

Wisconsin's self-defense privilege permits "[a] person … to threaten or intentionally use force against another for the purpose of preventing what the person reasonably believes to be an unlawful interference with his person or her person by such other person." Wis. Stat. § 939.48(4)(1). But he may only use such force (or threaten to use such force) as he reasonably believes is necessary to prevent or end the interference with his person. *Id.* "The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself." *Id.*

As a general matter, self-defense is regarded as an affirmative defense in Wisconsin law, in that it supplies a defense to the charged crime even where the State has otherwise succeeded in establishing each of the elements of that crime beyond a reasonable doubt. *See State v. Austin*, 836 N.W.2d 833, 837 (Wis. Ct. App. 2013). With an intentional crime such as murder, for an example, a jury might find that the defendant meant to cause the death of another person but at the same time find that he reasonably used lethal force against that person in defense of his own life. *See State v. Watkins*, 647

N.W.2d 244, 253 (Wis. 2002); Wis. Crim. Jury Instr. 801 n.1 (2021) ("in cases involving the intentional causing of harm … intent to cause harm and self-defense can exist at the same time"). In this way, self-defense does not negate any element of the charged offense but rather justifies or excuses the defendant's conduct as a legal matter. *See Smith v. United States*, 568 U.S. 106, 110, 133 S. Ct. 714, 719 (2013).

However, with respect to an offense like first-degree reckless injury, which is premised on a mens rea of reckless-ness, a successful assertion of self-defense does serve to negate an element of the crime, rendering self-defense a negative defense rather than an affirmative defense. *Austin*, 836 N.W.2d at 837–38 & n.6. Because the "criminally reckless conduct" element of reckless injury requires proof that the defendant has created an "*unreasonable* and substantial risk of death or great bodily harm to another person," § 939.24(1) (emphasis ours), proof that the defendant reasonably believed that the other person posed a risk of death or great bodily harm to himself and that the use of force was necessary to eliminate that risk will necessarily preclude a finding that the defendant's use of force was unreasonable and criminally reckless. *See id.*; Wis. Crim. Jury Instr. 801 n.1 ("A risk is not unreasonable if the conduct undertaken is a reasonable exercise of the privilege of self-defense.").

Once a defendant establishes the existence of a statutory affirmative defense (including self-defense), *see* n.8, *supra*, Wisconsin law, independent of federal due process require-ments, imposes on the State the burden of disproving the defense beyond a reasonable doubt. *Moes v. State*, 284 N.W.2d

66, 69–71 (Wis. 1979); *State v. Schleusner*, 454 N.W.2d 51, 54 (Wis. Ct. App. 1990); *see also State v. Kizer*, 976 N.W.2d 356, 360 (Wis. 2022); *State v. Stoehr*, 396 N.W.2d 177, 188 (Wis. 1986). In cases where the defense operates as a negative defense, as it does here, the State of course retains that burden of proof. *See Austin*, 836 N.W.2d at 837–38; *see also State v. Pettit*, 492 N.W.2d 633, 640 (Wis. Ct. App. 1992) (where defendant successfully asserts negative defense, "the burden is upon the state to prove beyond a reasonable doubt that defendant's evidence did not negate an element necessary to convict"). But because the defense in such cases serves to negate one or more elements of the charged crime, an error in describing the State's burden of proof with respect to a negative defense or in articulating the elements of the defense may well implicate the defendant's due process rights. *See State v. Schultz*, 307 N.W.2d 151, 156 (Wis. 1981) (if asserted defense challenges an element of the charged crime, "the state bears the burden of proving this element beyond a reasonable doubt" and in the face of negative defense, "the burden of persuasion cannot be placed upon the defendant without violating his right to due process of law"); *State v. McGee*, 698 N.W.2d 850, 856 (Wis. Ct. App. 2005) ("It would be a violation of due process to place the burden of persuasion on a defendant who would be asserting a negative defense, that is, a defense that negates a fact that the State must prove."); *Engle v. Isaac*, 456 U.S. 107, 121–22, 102 S. Ct. 1558, 1568–69 (1982) (acknowledging that, to the extent self-defense negates one or more elements of the charged offense, such that State must disprove the defense as part of establishing defendant's guilt on those offense elements, jury instructions that

improperly assign burden of proving self-defense to the defendant would present "a colorable constitutional claim").

As we have noted, Brown's theory is that the trial court's refusal to give a self-defense instruction incorporating the castle doctrine improperly modified the criminally reckless conduct element of the offense. Recall that the standard self-defense instruction, which the trial court in this case adopted, permits the jury, in assessing the reasonableness of the defendant's use of force, to consider whether he could have protected himself by retreating. By contrast, the castle doctrine removes the possibility of retreat from the jury's consideration. The castle doctrine also grants the defendant the benefit of a (rebuttable) presumption that he reasonably believed that his use of force in defending himself was reasonable. And as we have just explained, the jury's assessment of self-defense will inform its finding as to the second element of the reckless-injury offense—whether the defendant engaged in criminally reckless conduct. *See Austin*, 836 N.W.2d at 837–38. Brown thus reasons that the failure to instruct the jury consistently with the castle doctrine tainted not only the jury's consideration of self-defense but also its consideration of a key element of the charged offense. We shall elaborate on this point in a moment; first, we must address the question of fair presentment.

We agree with the district court that Brown fairly presented this due process claim to the Wisconsin courts. Although his principal brief to the Wisconsin Court of Appeals largely argued that the jury instruction on self-defense was erroneous as a matter of state law, the brief also noted that "[a] failure to properly instruct the jury in such circumstances [when the evidence supports the instruction] … violates the federal due

process right not to be convicted 'except on proof beyond a reasonable doubt of every fact necessary to constitute the [charged] crime.'" R. 5-2 at 19. In support of that principle, the brief not only quoted from the Supreme Court's decision in *Winship* but cited this court's decision in *Sanders v. Cotton*, *supra*, 398 F.3d at 582–83, which granted habeas relief in an Indiana murder prosecution for a due process violation, based on the trial court's failure to instruct the jury that once the defendant asserted that he had acted in sudden heat, the State bore the burden of proving beyond a reasonable doubt that the defendant did *not* kill the victim in sudden heat, which as a matter of Indiana law distinguished voluntary manslaughter from murder. It would therefore have been clear to the Wisconsin court that, in Brown's view, the instructional error rose to the level of due process violation. It is true, as the State points out, that Brown did not specifically explain how the omission of the castle doctrine language from the self-defense instruction effectively modified the "criminally reckless conduct" element of the reckless-injury offense. But the brief certainly did make the point that the self-defense instruction as given improperly allowed the jury to consider the opportunity to retreat in assessing the reasonableness of his actions, and having expressly raised his due process right to have the jury properly instructed on each element of the offense, the state court would have been on notice that the flaw in the self-defense instruction might have influenced the jury's assessment of the "criminally reckless conduct" element of the offense. Brown did enough to alert the state court to the basis for his constitutional claim.

We can also assume, without deciding, that the instructional error rose to the level of a due process violation. As the State points out, the Supreme Court has drawn a distinction between instructional errors regarding the elements of the charged offense and errors that concern only an affirmative defense, and it has been reticent to characterize the latter category of errors as presenting a due process problem. *See Gilmore*, 508 U.S. at 343, 113 S. Ct. at 2118 (*Winship*'s due process guarantee does not apply to instructions that merely present risk jury will not consider evidence bearing on affirmative defense); *Engle*, 456 U.S. at 120–21, 102 S. Ct. at 1567–68 (State may assume burden of disproving affirmative defense without also making disproof or absence of the defense an element of the crime; and unless state law otherwise treats absence of affirmative defense as an element of the charged offense, error in instructing jury as to the defense may only establish violation of state law rather than a violation of Constitution); *Patterson v. N.Y.*, 432 U.S. 197, 210, 97 S. Ct. 2319, 2327 (1977) (where affirmative defense does not negate any element of charged crime, Due Process Clause does not compel State to disprove its existence beyond reasonable doubt, and jury instruction placing burden on defendant to establish defense by preponderance of evidence does not pose constitutional problem: "Proof of the non-existence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here."). It also warrants mention that the jury in this case was properly advised, consistent with Wisconsin law, that the burden was on the State to establish beyond a reasonable doubt not only the

elements of the charged reckless-injury offense, but also that Brown did not act in self-defense when he injured K.M. *See Engle*, 456 U.S. at 121–22, 102 S. Ct. at 1568–69.

Still, there are reasons to believe the failure to instruct the jury in accord with Wisconsin's castle doctrine did implicate his due process rights.[10] As we have discussed, with respect to the charged reckless-injury offense, self-defense operates to negate an element of that offense: if the defendant's use of force to defend himself was reasonable, then his conduct could not have been criminally reckless. To this extent, the absence or disproof of self-defense could be equated with an element of the reckless-injury offense. *See* Wis. Crim. Jury Instr. 801 n.1 (in recklessness cases, "the absence of the privilege [of self-defense] is identified as a fact the state must prove in addition to the statutorily defined elements of the intentional crime"); *Austin*, 836 N.W.2d at 838 (where pattern self-defense instruction advised jury that it should consider evidence related to self-defense in deciding whether defendant's conduct created an unreasonable risk to another but also implied that defendant must satisfy jury that he was acting in self-defense, instruction improperly removed burden of proof from State to show that defendant was engaged in criminally reckless conduct). As Brown sees it, the trial court, by refusing to modify the self-defense instruction in accordance with the castle doctrine, expressly and erroneously allowed the jury to

---

[10] As noted, the Wisconsin Court of Appeals itself did not consider whether the instructional error constituted a violation of Brown's due process rights. Rather, it accepted the State's confession that the instruction was contrary to Wisconsin law but concluded that the error was harmless.

consider whether Brown could have retreated, and in so doing modified not only what the jury could consider reasonable in assessing his use of force in self-defense, but also what it could consider *un*reasonable in assessing whether Brown's conduct was criminally reckless as charged. In the latter regard, Brown argues that the jury instruction re-defined an element of the charged offense in a way that lightened the State's burden of proof and hampered his own claim of self-defense. Put concretely, the instruction as given permitted the jury to convict Brown on a ground that the castle doctrine fore-closed—that he could have retreated from the confrontation with K.M. but did not—and thus that his use of force in self-defense was not reasonable but rather amounted to criminally reckless conduct.[11]

But we are nonetheless satisfied that any such due process violation was harmless. The Wisconsin Court of Appeals reached the same conclusion on direct review of Brown's conviction, concluding "beyond a reasonable doubt that a rational jury would have come to the same conclusion absent the [instructional] error." R. 5-5 at 12 (quoting *Seitz*, 895 N.W.2d at 808). The state court in so holding applied the prejudice inquiry for constitutional errors articulated by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), for cases

---

[11]  Brown's focus in making this argument is on the aspect of the castle doctrine that precludes consideration of retreat rather than the presumption that he reasonably believed his use of force was necessary to protect himself. That presumption assists a defendant, to be sure, but it arguably does not impact the definition of an element of the charged offense in the way that foreclosing the factfinder's consideration of a particular circum-stance (here, the possibility of retreat) does.

on direct review. *See Seitz*, 895 N.W.2d at 808 n.21. It thus falls to us under the AEDPA to consider whether the state court's application of *Chapman* was reasonable. § 2254(d)(1); *see Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022); *Fry v. Pliler*, 551 U.S. 112, 119, 127 S. Ct. 2321, 2326 (2007) (citing *Mitchell v. Esparza*, 540 U.S. 12, 124 S. Ct. 7 (2004) (per curiam)). But in order to prevail on his habeas petition, it is not enough for Brown to show the Wisconsin Court of Appeals unreasonably applied *Chapman* in assessing whether the instructional error prejudiced him; separately, he must also show that the instructional error had a "substantial and injurious effect or influence" on the jury's verdict under *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S. Ct. 1710, 1722 (1993), which specifies the standard that a federal habeas court must apply in assessing the prejudicial impact of a constitutional error in a state-court criminal proceeding. *See Brown*, 142 S. Ct. at 1524. As the Supreme Court's recent decision in *Brown* makes clear, these are analytically distinct inquiries, and if the petitioner fails to make either showing, then his request for relief must be denied. *Id.* Thus, if Brown does not succeed in convincing us that he was prejudiced by the flaw in the self-defense jury instruction in accord with *Brecht*, that conclusion obviates the need to separately consider whether the state court's application of *Chapman* was unreasonable under the AEDPA. *Id.* at 1528.

*Brecht* directs us to consider whether the error "had substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *see also Ayala*, 576 U.S. at 267–68, 135 S. Ct.

at 2197–98; *Fry*, 551 U.S. at 121–22, 127 S. Ct. at 2328. And in contrast to *Chapman*'s prejudice inquiry, as to which the State bears the burden of persuasion, *see Brown*, 142 S. Ct. at 1523, it is the habeas petitioner who bears the burden of demonstrating that the error had such an effect or influence, *see Brecht*, 507 U.S. at 637, 113 S Ct. at 1722; *Brown*, 142 S. Ct. at 1523.

> There must be more than a reasonable probability that the error was harmful. The *Brecht* standard reflects the view that a State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.

*Ayala*, 576 U.S. at 268, 135 S. Ct. at 2198 (cleaned up). Ultimately, a court may grant habeas relief only if it is in "grave doubt" as to whether the federal error had a substantial or injurious effect in determining the jury's verdict. *Id.* at 267–68, 135 S. Ct. at 2197–98.

Initially, Brown suggests that we should apply *Chapman* here, such that the burden is on the State to show beyond a reasonable doubt that the instructional error did not influence the verdict; but he is wrong in this assertion. He relies on *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827 (1999), which applied *Chapman* in determining whether, in a federal criminal prosecution, a jury instruction that erroneously omitted an element of the offense was harmless. Thus, the Court asked, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id.* at 18, 119 S. Ct. at 1838. But the *Chapman* standard for harmlessness

governs cases, like *Neder*, that are on direct review. In a habeas case, it is *Brecht* rather than *Chapman* that governs. *Brown*, 142 S. Ct. at 1523–24; *Wilber v. Hepp*, 16 F.4th 1232, 1247 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1443 (2022).

Brown has placed a great deal of emphasis on the notion that the instructional error permitted the jury to consider whether he had the opportunity to retreat into his home. But as Judge Crabb pointed out below, even if the jury had been properly instructed in accordance with the castle doctrine, the jury would still have been free to consider the possibility of retreat *unless* it accepted Brown's account that K.M. charged up the driveway at him. 521 F. Supp. 3d at 801–02. Yet, the jury could readily have rejected his version of events and credited the testimony of other witnesses that Brown confronted K.M. in the street. *Id.* Brown's counsel has done a respectable job of marshaling every possible argument in favor of his factual case and against the State's case on this point. But like the district judge, we are not persuaded that a properly instructed jury would have accepted his factual account of the key events culminating in the stabbing.

Multiple witnesses, including Brown himself, agreed that K.M. had been walked to his car on the street after the initial scuffle between the two men. At that point in time, there was no real threat to Brown.

Only Brown testified that K.M. subsequently charged up the driveway. K.M.'s wife, Rebecca, directly contradicted Brown on this point, testifying that Brown walked down the driveway and confronted K.M. in the street. Kelan Phillips likewise told police that Brown walked to where K.M. was

standing in the street and it was there that he struck K.M. down.[12]

It is true that Cynthia Harms testified she witnessed (heard more than saw) a scuffle next to the Mustang parked in the driveway, at which point she left her upstairs window to retrieve her phone and call 911, and upon returning to the window saw K.M. at the bottom of driveway, where he stepped toward, and then fell in front of, his nearby car. Harms' testimony was, as the state appellate court characterized it, "ambiguous." R. 5-5 at 10. Harms testified that at no point in her observations from the window did she see Brown. Brown appears to infer from the fact that Harms saw K.M. standing at the bottom of the driveway and collapsing as he moved toward his car, but did not see Brown himself, that her account supports the notion that the stabbing must have taken place on the driveway and that K.M. walked back to the street after being stabbed. But Harms also denied seeing any fighting

---

[12] Brown notes that Phillips' statements to the police were out-of-court statements that would ordinarily be regarded as hearsay. The trial court allowed the State to elicit these statements after Phillips professed an inability to recall what he had observed on the night when Brown stabbed K.M. and what he had told the officers who interviewed him. In such circumstances, Wisconsin law allows a witness's out-of-court statements to the police to be admitted as substantive evidence as well as for impeachment. Wis. Stat. § 908.01(4)(a)(1); *Vogel v. State*, 291 N.W.2d 838, 844–45 (Wis. 1980). Brown argues that out-of-court statements are unreliable and should be discounted as a general matter, but he identifies no reason why Phillips' statements to the police should be discounted. Phillips was an eyewitness to the stabbing, and he made consistent statements to two different officers who interviewed him in the hours immediately after the incident.

take place in Brown's driveway, adding that she did not observe anything that had occurred between the initial scuffle she heard next to the Mustang parked in the driveway and the point at which she returned to the window and saw K.M. at the foot of the driveway.[13] Harms' testimony at best lends only minimal and indirect support to Brown's version of events.[14]

Importantly, the physical evidence at the scene also did not lend support to Brown's account that K.M. had stormed up the driveway and confronted him there. K.M. was stabbed not once but three times, which one would think would have caused immediate bleeding. (Brown's own arm wound, sustained in the initial scuffle, resulted in blood droplets and stains found in multiple locations: on the garage floor, on the Cadillac sedan parked in the driveway, and on a bottle of

---

[13] Harms told the 911 dispatcher that her view of Brown's driveway was blocked by trees.

[14] To be frank, it is not entirely clear from Harms' testimony which specific points in the chain of events leading up to the stabbing that she observed. When Harms first looked out her window, because she could not see who was involved in the scuffle next to the Mustang (she only saw shadows), she could have been witnessing the effort of Rebecca and other guests to separate K.M. from Brown and get him out to the car, as opposed to the initial tussle between Brown and K.M. in the garage. When Harms subsequently returned to the window after calling the 911 dispatcher and saw K.M. at the foot of the driveway, where he fell to the ground as he moved toward his car, she was presumably observing K.M. after Brown stabbed him in the head, but if so it is puzzling why, at the same time, she saw Rebecca standing in the driveway and heard her yelling at K.M. to get into the car, which by all accounts is what she was urging K.M. to do prior to the stabbing rather than after.

lighter fluid that Brown threw at K.M.) Yet, not so much as a drop of K.M.'s blood was found on the driveway; instead, there was a large pool of blood in the street in front of the driveway, with a streamlet of blood running from that pool along the gutter. (Rebecca testified that she had wrapped an undershirt around the knife in an effort to stanch the bleeding from K.M.'s head wound.) The prosecution reasonably argued to the jury that there would have been blood on the driveway if Brown's account were true.

Moreover, by the account of multiple witnesses, including Harms, Brown made threatening statements even after K.M. had collapsed in the street with the knife in his head, including "He's not dead yet, but I'll kill him," and, to Rebecca, "I've got one for you too, bitch." Brown acknowledged having made such statements in his testimony. These are statements that are inconsistent with the notion that Brown had been in fear for his safety and had struck K.M. in self-defense.

Brown suggests it is implausible that the jury credited the State's version of the events leading up to the stabbing—Rebecca's account in particular—given its decision to acquit him on the attempted homicide charge. The Wisconsin Court of Appeals addressed this point and rejected his interpretation of the acquittal: "[T]he more likely explanation is that the jury did not find beyond [a] reasonable doubt that Brown acted with the necessary intent to kill the victim." R. 5-5 at 11. Brown faults the court's reasoning in this regard. As he sees it, had the jury credited Rebecca's account that he was the aggressor, that he went into his house to retrieve a knife, and that he then traversed the length of the driveway and physically accosted K.M. with the knife in the street, then the jury

surely would have found that he intended to kill K.M. The jury instead must have concluded that K.M. was the aggressor, that K.M. confronted Brown in the driveway, and that Brown struck K.M. with the knife in self-defense. The jury would have acquitted him on the reckless-injury charge also, Brown reasons, but for the instructional error that permitted the jury to consider the possibility of retreat in assessing the reasonableness of the actions he took to defend himself.

But we discern nothing irrational about the Wisconsin appellate court's observation as to the acquittal on the attempted homicide charge. Any attempt to explain why a jury acquitted the defendant on one charge but convicted him on another is a necessarily speculative enterprise. *See United States v. Powell*, 469 U.S. 57, 66–67, 105 S. Ct. 471, 477–78 (1984); *United States v. Askew*, 403 F.3d 496, 501 (7th Cir. 2005); *United States v. McGee*, 189 F.3d 626, 630 (7th Cir. 1999); *United States v. Nobles*, 69 F.3d 172, 188–89 (7th Cir. 1995). We certainly can assume that the jury, on a favorable view of the State's witnesses, *could have* convicted Brown on the attempted homicide charge, but we do not agree with Brown that the decision to acquit him on that charge necessarily or even likely means that the jury credited his own account of events and determined that K.M. was the aggressor and that he charged up at Brown in the driveway, thus compelling Brown to defend himself. As the state court noted, the attempted homicide charge required a significantly more culpable *mens rea* than the reckless-injury charge: an intent to kill versus an awareness that one's acts posed a risk of death or grave bodily harm to the victim. When presented with the not altogether uncommon scenario of a late-night, drunken brawl between aggrieved family members, the

jury might well have concluded that reckless injury was a better fit for the facts in this case than attempted first degree intentional homicide. Brown's decision to introduce a knife into his dispute with K.M. without question increased the odds that he might mortally wound his cousin, but the jurors were instructed that a conviction on the attempted homicide charge required them to find that Brown's acts "demonstrate[d] unequivocally" that he had formed an intent to kill K.M. R. 5-14 at 13–14. Brown, by his own admission to Jill Phillips, screwed up. Or as Kelan Phillips put it, Brown was a nice man who "just made a … mistake that day." R. 5-12 at 107. It is not difficult to imagine the jury deciding that Brown's words and actions reflected an awareness that he might grievously injure his cousin but did not "demonstrate unequivocally" that he intended to kill K.M. Like the state court, we are not convinced that the acquittal on the attempted homicide charge means that the jury adopted Brown's version of events and signals that he might well have been acquitted on the reckless-injury charge but for the instructional error.

Brown has also faulted the state trial judge and appellate court for finding, in light of the evidence we have described, that his account of events was incredible as they assessed whether or not the omission of the castle doctrine was harmless under *Chapman*. Given that we have engaged in a *de novo* review of harmlessness under *Brecht*, any purported faults in the state courts' own review for harmlessness are really beside the point. That said, Brown is correct that credibility assessments and the weighing of evidence are the province of the factfinder, and insofar as possible, we as a habeas court must avoid supplanting the role of a jury. *See Tyson v. Trigg*, 50 F.3d

436, 453 n.2 (7th Cir. 1995) (Flaum, J., concurring) (collecting cases).

Nonetheless, *Brecht* requires that we make a probabilistic assessment in determining whether the instructional error had a substantial and injurious effect or influence in determining the jury's verdict: we must ask ourselves "whether a properly instructed jury would have arrived at the same verdict, absent the error." *Armfield v. Nicklaus*, 985 F.3d 536, 543–44 (7th Cir.) (quoting *Czech*, 904 F.3d at 577), *cert. denied*, 142 S. Ct. 190 (2021). And as the district court pointed out, that requires us to consider, *inter alia*, the overall strength of the State's case against the totality of the evidence. 521 F. Supp. 3d at 801 (citing *Czech*, 904 F.3d at 577). In doing so, we may necessarily touch upon questions of witness credibility and the plausibility of the parties' respective theories of the case. *See Toney v. Peters*, 48 F.3d 993, 998 (7th Cir. 1995) (collecting cases).

For all of the reasons we have set out, we harbor no grave doubt as to whether a properly instructed jury still would have convicted Brown. The State had a strong case against Brown which established not only that the final physical confrontation between him and K.M. took place in the street, off of Brown's property, but also, as the district court noted, that Brown was the aggressor. 521 F. Supp. 3d at 802. No testimony other than Brown's supported his version of events, the physical evidence did not corroborate his averment that the stabbing took place in his driveway, and, as the district court emphasized, Brown's own words in the aftermath of the stabbing suggested that he had stabbed K.M. in anger rather than in fear for his life. *Id.* at

803. In short, Brown has not shown that he was actually prejudiced by the trial court's error in instructing the jury.

## III.

For the foregoing reasons, we AFFIRM the judgment.